Eva W. ELMS, Plaintiff,

v.

Otis R. BOWEN, M.D., Secretary of
Health and Human Services,
Defendant.

Civ. A. No. 88–1101–T.

United States District Court,
D. Kansas.

Jan. 3, 1989.

Richard J. Peckham, Wichita, Kan., for plaintiff.

Stephen K. Lester, Asst. U.S. Atty., Wichita, Kan., for defendant.

## OPINION AND ORDER

THEIS, District Judge.

This matter comes before the court on the Secretary's motion to affirm a denial of widow's benefits under Title II of the Social Security Act. Plaintiff filed a timely appeal pursuant to 42 U.S.C. § 405(g). After carefully reviewing the record, the briefs and the applicable law, the court is prepared to rule.

The proper resolution of this case turns on the question of who is the widow of the deceased, James Elms (James), who died on August 6, 1986. The Secretary must pay widow's benefits to the decedent's legal widow. 20 C.F.R. § 404.337(b)(3). The law of the jurisdiction where the decedent is domiciled at his death governs the question of who is the legal widow. 42 U.S.C. § 416(h)(1)(A); *Stokes v. Heckler*, 773 F.2d 990, 991 (8th Cir.1985).

At the time of James' death, plaintiff (Eva) presumed she had been lawfully married to James for the previous thirty-three years, since their wedding in 1953. Eva applied for and initially received widow's benefits. The Secretary terminated Eva's benefits in January 1987 because he determined Mary Parker (Mary) was still married to James. Eva presented her claim to an administrative law judge (ALJ) in July 1987. The ALJ ruled against her, and the Appeals Council affirmed.

Mary's claim to benefits rests on the lack of a court record of a second divorce from James. Mary and James first married in November 1939. The couple had two children during their first marriage. They divorced in December 1944 but remarried in February 1945. Between 1945 and 1950, Mary had two additional children. The parentage of these two children and the living relationship of Mary and James is disputed. Eva testified before the ALJ about James' version of some key events. James informed her that when he returned home from the war, he discovered Mary had di-

vorced him. James further claimed he and Mary lived together infrequently over the next five years (1946–1950) and that another man fathered the children Mary gave birth to in 1948 and 1950. Mary claims she lived with James until 1952 when he moved to Wichita, Kansas, to work and that he was the father of the second set of children.

Mary married another man, William Parker, sometime in 1952. She testified James told her he got a divorce from her in 1951 or 1952. The marriage to Parker lasted until 1960. Mary remarried two additional times. Eva married James in 1953—more than a year after Mary's marriage to Parker. Both Mary and Eva believed the James–Mary marriage was dissolved at some point prior to the next round of marriages by Mary and James in 1952 and 1953.

The ALJ ruled in favor of Mary, despite the *strong* presumption in Kansas law that a first marriage is dissolved before a second is started. The ALJ found that both Mary and Eva gave credible testimony. Tr. at 12. He concluded both women were "duped" by James; James told each a different version of how the Mary–James marriage ended. *Id.* The ALJ concluded from the different stories told to each women that "(t)here never was a second divorce from Mary, ...." Tr. at 12–13. When the ALJ combined James' duplicity with the *absence* of a divorce decree in the records of the counties in the states where James lived at the relevant times, he concluded Mary had overcome the presumption of the validity of the second marriage and was the legal widow of James. Tr. at 13. The ALJ's evaluation is the final decision of the Secretary reviewed by the District Court.

█ This Court is quite familiar with the standards to be applied when reviewing a decision of the Secretary. The standard of review in this case is established by 42 U.S.C. § 405(g), which provides that "the finding of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive ..." Substantial evidence is that evidence which a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 402, 91 S.Ct. 1420, 1427–1428, 28 L.Ed.2d 842 (1971). It is not the duty of the Court to reweigh the evidence. *Garrett v. Califano,* 460 F.Supp. 888, 890 (D.Kan.1978); *Manigan v. Califano,* 453 F.Supp. 1080, 1086 (D.Kan.1978). Substantial evidence, however, must be more than a mere scintilla. *Perales,* 402 U.S. at 403, 91 S.Ct. at 1428. This Court cannot affirm the Secretary's decision by isolating a few facts and calling them "substantial evidence." *Cline v. Califano,* No. 78–4166 (D.Kan., *unpublished,* August 31, 1979). It is the Court's duty to scrutinize the entire record to determine whether the Secretary's conclusions are rational. *Keef v. Weinberger,* 404 F.Supp. 1193 (D.Kan.1975). In applying these standards, the Court must keep in mind that the purpose of the Social Security Act is to ameliorate some of the rigors of life for those who are disabled or impoverished. *Dvorak v. Celebrezze,* 345 F.2d 894 (10th Cir.1965).

█ Substantial evidence does not exist to support the Secretary's decision. The ALJ incorrectly applied Kansas law, the operative body of law to determine who was James' legal widow. 42 U.S.C. § 416(h)(1)(A). The presumption of the validity of the second marriage in Kansas is considerable. "(T)he evidence to overcome the presumption of the validity of the subsequent marriage must be clear, strong and satisfactory, and so persuasive as to leave no room for reasonable doubt." *Harper v. Dupree,* 185 Kan. 483, 487, 345 P.2d 644 (1959).

A review of *Harper* demonstrates that the ALJ did not accord the second marriage to Eva an appropriate amount of deference. In *Harper,* Ruth Dupree/Harper (Ruth) married and divorced James Dupree by 1936. In the late 1930's and early 1940's, she married and divorced Stout. In the late 1940's, she married and divorced Okle. In 1951, Ruth married Arthur Harper (Arthur). After a discussion with his mother-in-law, Arthur became concerned that Ruth was not properly divorced from Dupree. Ruth placated Arthur's concerns by telling

him she divorced Dupree in El Dorado, Kansas. *Harper,* 185 Kan. at 484–86, 345 P.2d 644. Arthur moved for an annulment of his marriage to Ruth in 1958 because of the lack of a valid divorce from James Dupree. The trial court granted the annulment based on Harper's testimony *and* his introduction of certificates from several counties showing the absence of a Dupree divorce decree. *Id.* at 484, 486, 345 P.2d 644.

The Kansas Supreme Court reversed. First, they disallowed the admission of the county records certificates. Second, even if the certificates were admissible, "the most that can be said of them is that they were merely 'persuasive' of the fact that defendant and Dupree had not been divorced in the several counties mentioned." *Id.* at 486, 345 P.2d 644. The "merely 'persuasive'" facts could not resurrect the first marriage:

> The presumption of validity of the marriage of plaintiff and defendant in July, 1951, is 'one of the strongest known to the law.' In order to overcome such presumption it was necessary that plaintiff affirmatively establish the nondissolution of defendant's prior marriage to Dupree 'by proof so cogent as to compel conviction.' It is clear that his evidence failed to meet the burden of proof required in such cases,....

*Id.* at 488, 345 P.2d 644.

The only factual difference between the instant facts and those in *Harper* is that in this instance a second story about the earlier divorce exists: James' story to Mary that he divorced her in 1950 or 1951 instead of the 1946 emergency divorce version told to Eva. The ALJ seized on James' inconsistent stories to the two women to manufacture sufficient evidence to overcome the presumption. Tr. at 12–13. While the court does not dispute the credibility determination made by the ALJ that James "duped" both women, the court does depart from the ALJ's extrapolation from this evidence.

The court does not attach an inordinate amount of significance to James' inconsistent versions. The court is generally aware of the malleability of dates and events in matters concerning the marital relationship. One party may feel a need to cloak an event in garb that absolves them of misconduct, while not denying the basic result. For example, James may have told Eva that Mary divorced him to protect his honor and character when in fact he divorced Mary to go north to Wichita on a lark. While James' conduct may demonstrate a loose treatment of facts to suit his interests, James maintained to everyone on many occasions that he was divorced from Mary. Mary had the burden of proof to "affirmatively establish the nondissolution of [James'] prior marriage ... 'by proof so cogent as to compel conviction.'" *Harper,* 185 Kan. at 488, 345 P.2d 644. The inconsistent versions of the divorce raise doubts about the existence of a second divorce but they do not "affirmatively establish the nondissolution" of the prior marriage. *Id.* As the Kansas Supreme Court noted in *Harper,* the county records certificates merely demonstrate that the couple was not divorced in those locations. *Id.* at 486, 345 P.2d 644. This court in accord with state law can give the records admitted by the ALJ no greater weight. The second marriage withstands scrutiny under *Harper,* and the ALJ must be reversed.

IT IS BY THE COURT THEREFORE ORDERED that the Secretary's motion to affirm is denied. IT IS FURTHER ORDERED that the Secretary award widow's benefits to Eva W. Elms.